THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. PHILIP DERRINGER, Appellant.

73 203,
142a 629

*Question of fact for the jury — error in the charge — when insufficient to justify a reversal — how cured — new trial, when ordered in the absence of exceptions.*

Four disinterested witnesses gave evidence upon the trial of a person under indictment for manslaughter, from which it could be fairly inferred that the prisoner set upon his wife, struck her in the face with such force that she fell repeatedly against the door and upon the floor, and produced injuries sufficient, as testified to by the doctors, to produce cerebral hemorrhage, from which she died, while the prisoner gave testimony, which was uncorroborated, tending to show that he did not inflict the injuries sustained by his wife.

*Held*, that the utmost that could be fairly claimed for the prisoner upon the testimony was that it presented upon conflicting evidence a question of fact for the jury.

Where a witness testifies as to certain statements made by a child too young to be produced in court as a witness, and in his charge the trial judge refers to the statements made by the child as its "testimony," the error committed is not sufficient to justify a reversal of the judgment.

The court charged: "It is not because a man's character is good that juries are entitled to say that he did not commit the act." Thereafter two subsequent requests were made by the prisoner's counsel as to the weight to be attached to, and the benefit to be derived from, the evidence of good character which in the very language of the requests were charged by the trial judge.

*Held*, that even if the charge of the court was justly subject to criticism, the prisoner, because of the charges having been afterward made as requested, had no real grievance.

It is only where an appellate court is satisfied that a verdict against a prisoner is against the weight of evidence, or against the law, or that justice requires a new trial, that it is justified, in the absence of exceptions, in ordering a new trial.

FIRST DEPARTMENT, NOVEMBER TERM, 1893.            [Vol. 73.

APPEAL by the defendant, Philip Derringer, from a judgment of the Court of General Sessions of the Peace in and for the city and county of New York, entered on the 29th day of June, 1891, upon the verdict of a jury convicting the defendant of the crime of manslaughter in the second degree.

*B. P. Ryan*, for the appellant.

*Henry B. B. Stapler*, for the respondent.

O'BRIEN, J. :

By a jury the prisoner was conivcted of the crime of manslaughter in the second degree, for having beaten his wife on April 14, 1891, from the effects of which she died on the following day. The conviction is assailed upon the following grounds :

*First.* That he is entirely innocent of the crime charged.

*Second.* That the defendant did not have a fair and impartial trial.

*Third.* That improper evidence was introduced and allowed to weigh against the defendant.

*Fourth.* That the court in its charge, and during the trial, erroneously stated the law to the jury, which errors brought about the conviction of the defendant, independent and apart from the evidence in the case.

*Fifth.* That the good character of the plaintiff, as against the questionable character of the deceased, was not permitted to weigh in his favor.

If the first position is tenable then the judgment of conviction will necessarily fall, and our attention will be mainly directed to the consideration of this question, which in its discussion will involve, to some extent, an examination of the other grounds urged. The appellant contends that, excepting the testimony of relatives of the deceased as to declarations of the prisoner prior to his wife's death that he would kill her, and subsequent admissions that he had done so, and to which improper weight was allowed to be given, the record fails to disclose any evidence of defendant's guilt.

With respect to prior declarations of his intention to consummate the crime of which he was finally convicted, if made upon a single occasion or to but one person who was a relative of the deceased, there might be some force in the suggestion made of bias on the

part of such relative, which would invite scrutiny and which should be carefully weighed before giving full credence thereto. The same remarks are applicable to the declarations and conduct of the prisoner when, after the death of his wife, he was confronted by her relatives and charged with the commission of the crime. It is true that to some he denied it, but to others, if their testimony is to be believed, he either admitted the fact or remained silent when accused of the crime. Thus, the record shows that on a number of occasions, and to different members of the family of the deceased, the prisoner frequently stated that he would kill her, and after her death he either tacitly or expressly admitted that he had done so. But apart from the number of persons to whom these declarations were made, and all of whom it could not be assumed testified falsely, there is in the case evidence to show that the prisoner's treatment of his wife was always marked with the greatest brutality and cruelty.

If, however, we leave out of consideration all these declarations, and the evidence of his cruel and inhuman treatment of his wife on other occasions, we think that a brief summary of the testimony relating to what occurred on the night preceding her death will amply justify the conclusion reached by the jury.

On April 14, 1891, the prisoner and his wife resided on the top floor, back, of the premises 211 West Thirty-first street. On the same floor and across the hallway lived one Mrs. Denzer; on the floor below one Mary Pendergast and Gussie Haug. In the afternoon of that day the wife came up the stairs to her apartments with her little girl Lena. She had been seen at eleven o'clock in the forenoon of that day by Mary Pendergast, and at six o'clock in the afternoon by Mary Murray, and also at about six o'clock by Sarah Bruner and one Peter Cannon. And all these witnesses agree that she was sober, clean and neat in appearance when they saw her. This testimony is material and important in view of the defense set up that, upon returning to his apartments at eight o'clock, the prisoner found his wife in a helpless state of intoxication, and that the falls which, as we shall show, were testified to by the witnesses as having occurred in the room (and one of which the prisoner admits to have happened) were not due to any act or blow of his, but were the result of her intoxicated condition which caused her to fall from a chair to the floor.

FIRST DEPARTMENT, NOVEMBER TERM, 1893.          [Vol. 73.

On the evening of that day Mrs. Denzer was in her own kitchen, and was there visited by Mary Murray, Annie Pauley and Mary Pendergast, all being together in Mrs. Denzer's room when the appellant came up the stairs leading to his apartment. What then occurred, though there is a slight variance in the way in which each of the witnesses told her story, is thus detailed :

Mrs. Denzer testifies that she heard Derringer coming up the stairs after eight o'clock on the evening of April fourteenth. She knew his step because she heard it every night. He went into his room and closed the door. She heard him say, " God-damn-son-of-a-bitch, where is my supper," twice, and then there was a heavy fall; the deceased screamed and said, " Please don't hit me," and then there was another heavy fall. The deceased screamed again and said, " Billy, Billy, I am dying, I am dying ! " The appellant answered, " You God-damn-son-of-a-bitch, die, right there ! " and another heavy fall was heard. Mrs. Derringer screamed again, saying, " Oh, Lena, oh, Lena ! " and then everything was quiet. Derringer then sent the little girl Lena out of the room.

Mary Pendergast testified that she was in the room of Mrs. Denzer on the evening of Tuesday, April fourteenth, at about eight o'clock; that she heard Derringer quarreling with his wife, and heard her fall against the door, and heard her crying ; she heard Mrs. Derringer say, " Oh, please leave me alone," and heard Derringer say, " I will show you."

Annie Pauley testified that on the evening in question she was in Mrs. Denzer's room; that she heard Derringer's step, which she knew; that she heard him, when he entered, say, " You God-damn-son-of-a-bitch," and then a sound like a slap to right and left in the face, and then a fall. She then heard a second fall, heavier than the first, and heard Mrs. Derringer say, " Oh, Bill, oh, Bill, I am dying," to which he replied, " You die, right there, you God-damn-son-of-a-bitch." Mrs. Derringer then cried out, " Oh, Lena, oh, Lena, my little child," and the witness heard nothing more except that she heard Derringer say, before the noise ceased, " You won't cook any more supper for me."

Mary Murray testified that she was in Mrs. Denzer's rooms between eight and half-past eight o'clock on the evening of April fourteenth, Tuesday. She heard quarreling next door in Derringer's rooms, and

in a little while heard a heavy fall. She then heard Mrs. Derringer say, " Oh, Billy, oh, Billy, I am dying." He replied, " God-damn-son-of-a-bitch, die, right there." She recognized both the voice of Mrs. Derringer and of the appellant. Everything then became quiet.

Mrs. Haug, a tenant of the same house, living on the floor immediately below the rooms of the appellant, was out upon her fire escape taking in her clothes on that evening. She heard Mrs. Derringer crying, and heard him scolding and slapping her, calling her a bitch and a son-of-a-bitch. Mrs. Haug then heard a terrible fall and heard Mrs. Derringer scream ; and afterward all was still.

After this scene Mrs. Denzer heard Derringer open the door and let out the child Lena, who went to the residence of her mother's father, Thomas Finnan, at No. 204 West Thirty-second street.

After the child had left the rooms, Derringer went down stairs, and within about five minutes was seen by Mary Murray to return, bringing with him a short stout young man whom she did not know. Derringer and this young man entered the rooms, closing the door behind them. The identity of this third person is placed in doubt by the prisoner's statement that the only one who entered the rooms that night besides himself was the father of his wife, who, having inquired for his daughter and being told that she was in bed, did not go into the bedroom, but returned to his own house. Whether the wife at the time her father called on that evening was dead or alive will always be a matter of conjecture, though the prisoner testifies that she was asleep on the bed, where she remained until some time between one and two o'clock, when, having fallen out upon the floor, he got up and replaced her on the bed, and that upon awakening about five o'clock in the morning he found that in the meantime she had died, and that he thereupon went and notified her relatives. On their reaching the house they found the deceased lying on the bed, with one foot hanging out, her hair dishevelled and thrown over her face, and her hands thrown up ; her lips were swollen and smeared with blood ; there was a large bruise over the right eye, and the sheet was bloody ; the back of her hand was smeared with blood from her wrist to the tips of her fingers, as if she had wiped her mouth with the back of her hand.

The prisoner testified that he arrived home at eight o'clock that evening, and on entering asked his wife if she had any supper for

FIRST DEPARTMENT, NOVEMBER TERM, 1893.          [Vol. 73.

him, and that his child said that she was hungry and had had no
supper yet; that he then turned round and spoke to his wife, then
went into the hall, and in the meantime she had fallen from the
chair up against the door; that he then sent the child to her grand-
mother's, and with that the wife jumped from the floor and attacked
him, when he slapped her on each side of the face; that she then
went into the front room from the kitchen where she stayed a few
minutes, "until I had the child's hat and shawl on, and then I took
her and laid her in the bed and she went to sleep, and I left her
there." That the child went out and subsequently came back with
his father-in-law. "He managed to undress the young one and put
her to bed. I went and took off my wife's shoes. She was breath-
ing regularly; I had no apprehension that she had seriously injured
herself when she fell off the chair. Then I undressed and went to
bed; it was about eleven o'clock; I put the light down and laid in
bed then; I guess it must have been one or two when I heard
another fall, and found that she had fallen between the crib
and the bed. I picked her up and she went back the same way as
she had laid before, and I thought no more of it. * * * I went
to sleep and woke up next morning and found her dead."

The claim advanced that the evidence of the People's witnesses,
offset by this uncorroborated statement of the prisoner, supports the
contention that he is entirely innocent of the crime charged, seems
to us to show a failure to apprehend the force and effect of evi-
dence. Here are four disinterested witnesses, all of whom gave tes-
timony from which it could fairly be inferred that, on returning
home that night, the prisoner set upon his wife, striking her in the
face with such force that she fell repeatedly against the door and
upon the floor, and producing injuries sufficient, as testified to by
the doctors, to produce cerebral hemorrhage, from which she died.
The utmost that could be fairly claimed for the prisoner upon the
testimony is, that it presented, upon conflicting evidence, a question
of fact, and with respect to the rule that should govern this court
upon appeal we have had occasion repeatedly to quote from the
opinion of this General Term in *Carrington* v. *The People* (6 Par-
ker Crim. Rep. 342), wherein DANIEL, J., says:

"It is a familiar principle in our jurisprudence that the jury shall
determine all questions of fact presented in the controversy sub-

mitted to their deliberation, even though the evidence upon which they arise may be slight and in a great measure unsatisfactory. The law regards the court as possessing no superior qualifications over the jury for the determination of mere questions of fact."

It will be seen, therefore, that, apart from the prior or subsequent declarations and conduct of the prisoner, sufficient evidence was given to render it a case which should properly have been submitted to the jury. But when, in addition, we consider these declarations and the conduct of the prisoner in the light of the surrounding circumstances, the conclusion is almost irresistibly forced upon us that the prisoner was responsible for his wife's death.

It is unnecessary to detail all these circumstances, but one in particular, upon which an exception is predicated, requires to be briefly noticed.

Mrs. Nolte, a sister of deceased, at about half-past six on Wednesday morning, the fifteenth, went to the residence of her father, where she saw the child, Lena Derringer, and had a conversation with her. This child at the time was about four years old. Mrs. Nolte thereafter went to the prisoner's rooms, where she found her father and her sister, Mary Finnan. The prisoner shortly afterwards came in from the undertaker's, and the conversation which Mrs. Nolte says then occurred between her and the prisoner is here given in her words : "I cried, and I said, ' Oh, Billy, you have killed her at last ; ' I said, ' You have often said you would do it.' He said, ' I did not.' I says, ' Your child Lena is after telling me over in my father's how papa beat mamma ; he beat her awful hard, Aunt Maggie, and knocked her down, and then threw her on the bed.' " To this Derringer made no reply.

If this statement is to be credited, it is a strong corroborating circumstance tending to show the prisoner's guilt. Here was a statement made by the sister-in-law, charging him with having committed the crime, and basing such charge upon a statement made by his own child that he had beaten the deceased and thrown her on the bed, where it is stated she was on the following morning found dead. This testimony was referred to by the learned trial judge in his charge to the jury, and some stress placed upon it, because it was justly regarded by him as significant. In his charge referring to it, he says :

FIRST DEPARTMENT, NOVEMBER TERM, 1893.        [Vol. 73.

" Now, that child was a child of tender years, and a child whose testimony could not be produced in this court, because she was too young to be sworn as a witness in this case, but her testimony is, in this case, in the form of a conversation had with this defendant. You are not entitled to give it all the weight and authority that you would give to it if it were testified to by a person of mature years, but it is something that you can consider in the case, and give it the weight that you think it is entitled to."

The learned judge, it will be observed, spoke of the child's " testimony " when he undoubtedly had it in mind to refer to her statement, but we do not think this error sufficient to justify a reversal of the judgment.   There can be no doubt that it was entirely competent to have permitted Mrs. Nolte to testify as to what she said in the presence of the prisoner, and it cannot be assumed that the jury were misled by this statement of the court, because they were aware that the child was not examined, and they had knowledge of the way in which the statement made by the child to Mrs. Nolte got upon the record.

Another error assigned by appellant is directed to the court's charge upon the weight to be given to good character.   It is insisted that his charge, " it is not because a man's character ' is good that juries are entitled to say that he did not comit the act," is contrary to the rule laid down in *People* v. *McQuade* (110 N. Y. 309). Though this criticism be just, the prisoner has no real grievance, because, with respect to this question of character, two specific requests were made as to the weight to be attached thereto and the benefit to be derived from evidence of good character, which, in the very language of the requests, were charged by the learned trial judge.

A number of other grounds of error are assigned, but none of which in our judgment affected a substantial right, and, therefore, under the provisions of the Code of Criminal Procedure (§ 542) it becomes our duty " to give judgment without regard to technical errors or defects or to exceptions which do not affect the substantial rights of the parties."   In this connection, also, it should be remembered that few, if any, of these alleged errors are presented upon exceptions properly taken, and, therefore, it would only be in a case where the appellate court was satisfied " that the verdict against the prisoner was against

the weight of evidence or against law, or that justice requires a new trial, whether any exception shall have been taken or not in the court below" (Code Crim. Proc. § 527), that the court, in the absence of such exceptions, would be justified in ordering a new trial. It is with this provision in mind that we have examined the entire record for the purpose of determining whether, upon the merits, justice requires that a new trial shall be had; and with the jury, we are of opinion that the crime as charged was established, and that none of the errors assigned demands that their verdict be disturbed.

The case presents some phases of life which we are glad to think are exceedingly rare and exceptional. The prisoner was unfortunate in having been mated to a drunken wife. But any sympathy that might from this circumstance have been extended to him is entirely obliterated when we recall, as the record here discloses, that this was used as a pretext for the most cruel and inhuman conduct towards her, on occasions so frequent that one of the witnesses was led into stating that she heard him beat her every night. This was no doubt an exaggeration, but is indicative of the frequency with which, in the presence of his little child, he beat and ill-treated the woman he had promised to protect, and towards whom, in his defense, not a single act of kindness was shown, but whose entreaties when assaulted by him, even though it may have been in her drunken stupor, were met by the vilest and filthiest language that could be addressed by one human being to another.

We find no reason for disturbing this conviction, and think that the judgment appealed from should be affirmed.

Follett and Parker, JJ., concurred.

Judgment affirmed.